## J. MCD. TRIMBLE and C. A. BRALEY v. GUARDIAN TRUST COMPANY, Appellant.

### Division Two, June 20, 1912.

1. **ATTORNEYS: Powers of General Counsel for Corporation: Railroad Mortgage: Suit to Foreclose.** The Kansas City, Pittsburg & Gulf Railroad Company owned the stock of the Texarkana Company of Texas and of the Shreveport Company of Louisiana, but did not own the terminals which it used in Kansas City or on the Gulf. The Guardian Trust Company, defendant herein, was trustee in a mortgage given by the Pittsburg & Gulf, but owned no interest in the railroad. It did, however, have an interest in the terminals. The Pittsburg & Gulf having fallen into financial straits, a plan for reorganization was set on foot. A committee in New York was endeavoring to conduct the reorganization, while another committee of officers and stockholders, called the Philadelphia committee, was trying to do the same thing in accordance with different plans. Meantime the plaintiffs were general counsel for the defendant trust company. It seemed to the plaintiffs that it would be for the best interests of the trust company, because of its interest in the terminals, for the reorganization

to be conducted by the Philadelphia committee, so, as general counsel, but without specific direction, they brought suit to put the road into the hands of a receiver, joining the trust company as a defendant. They also brought suit to have receivers appointed for the Texarkana and the Shreveport lines, for whom also the defendant was trustee. Next, the defendant's cotrustee in the Pittsburg & Gulf mortgage had the suit against the Pittsburg & Gulf transferred to the Federal court and brought suit against that road and this defendant to foreclose the mortgage and have a receiver appointed. Following this, the plaintiffs agreed with counsel for the cotrustee that the first suit against the Pittsburg & Gulf and the suits against the Texarkana and the Shreveport roads should be dismissed and that they should be joint counsel for the receiver in the suit still pending. Afterwards the plaintiffs, using the defendant's name as trustee, again brought suit against the Texarkana and the Shreveport roads, to hamper the efforts of the New York committee toward a reorganization of the Pittsburg & Gulf. And although there was a provision that the trustee should have compensation for all services rendered about the trust, the plaintiffs provided for no such compensation in any of the suits mentioned, though they themselves were paid for their services as counsel for the receivers in the suit brought by the cotrustee. Any benefit, if any there was, accruing to the defendant from this litigation was too remote for consideration here. *Held*, that the plaintiffs cannot recover from defendant compensation for conducting the suits against the Texarkana and the Shreveport lines.

2. INDEMNITY: Against Claim of Third Person. One who, for a consideration, indemnifies another against the claim of a third person, does not assume any liability to such third person.

3. INTERVENING PETITION: Filed for Plaintiffs by Defendant's Counsel: Fees. The fact that the attorney for a trustee against whom these plaintiffs bring this suit for attorneys' fees, filed an intervening petition in another suit for foreclosure, asking for an allowance of the fees in question, does not estop the trustee from denying liability for the fees.

4. ATTORNEYS: General Counsel for Corporation: Salary: Additional Fees. Where attorneys have been employed for some years at a stated salary as general counsel for a corporation and that salary was paid them for the year in question, the fact that the records of the corporation do not show that the salary was fixed for that year does not render the corporation liable for additional fees within the scope of such employment.

5. ——: ——: ——: ——: Counsel's "Understanding" of Contract. Where plaintiffs were employed as general attorneys for the defendant on salary, the fact that the plaintiffs "understood" that the salary did not cover extra-urban litigation, does not render the defendant liable for fees asked for conducting such extra-urban litigation.

6. ——: ——: ——: ——: Officers as Attorneys: By-laws. The fact that plaintiffs were officers of the defendant corporation, and that a by-law of that corporation prescribed their duties as general counsel and did not limit their salary to fees for urban business, in the absence of a showing to the contrary, precludes them from a recovery of fees in addition to their salary.

7. ——: ——: Acting for Receiver: Fees. While plaintiffs had general charge of the business of the defendant trust company as its counsel, they were acting as counsel for the receiver of the trust company. Without the knowledge of the defendant (so far as the record shows) they aided in procuring the discharge of the receiver. *Held*, that plaintiffs cannot recover from defendant trust company fees for services rendered in procuring such discharge.

8. ——: ——: Intervention: Benefit to Client: Liability for Fees. When the plaintiffs as attorneys for the defendant filed an intervention in a foreclosure suit and saved rights to the defendant in the final adjudication of the suit, and where the defendant has followed for some time the suggestions made by the plaintiffs in that litigation, the defendant cannot resist the payment of fees for the intervention on the ground that the litigation was useless and was carried on solely for the purpose of charging fees.

9. ——: ——: Additional Counsel: Liability for Fees. Where a client suggests to his counsel the employment of additional counsel because of the importance of the litigation and the number and ability of the lawyers on the other side, the client and not his counsel is liable for the fees of the additional counsel.

10. RECEIVERSHIP: Prior Claims: Order of Federal Court: Effect on Jurisdiction of State Court. The order of the Federal court discharging the receiver of a corporation provided that any demand for a debt contracted by the corporation prior to the receivership should be presented to that court. *Held*, that that order does not deprive the State court of jurisdiction over this, a suit *in personam*, against the corporation for the collection of such claims, where there is no question involved as to any special property or funds of the corporation out of which the judgment may be paid.

Appeal from Jackson Circuit Court.—*Hon. J. H. Slover*, Judge.

REVERSED AND REMANDED (*with directions*).

*Harkless, Crysler & Histed* for appellant.

- (1) These suits were brought as a result of an effort of the plaintiffs themselves to be the first in the field for receivership with a, view of getting control of the receivership proceedings. (2) As to the items of $2500 and $2000 for filing the suits in the two courts in the south, Missouri, Kansas and Texas Trust Company v. Kansas City, Shreveport & Gulf and Missouri, Kansas & Texas Trust Company v. Texarkana & Ft. Smith Railroad, the proceedings were advised by plaintiffs themselves and the mortgages which they were seeking to foreclose expressly provided that the cost and expense of the attorneys' fees and the expense of the trustee itself should be charged against that property. The plaintiffs abandoned the proceedings, never made any claim in those cases for allowance of their fees or that of the trustee and the trustee could have no liability directly to the plaintiffs. (3) The undisputed testimony in the case outside of any other consideration shows that it is the custom where trustee is foreclosing in railroad mortgages that attorneys' fees are payable only from the property and not personally chargeable against the trustee. (4) After these suits were filed they were traded off, the consideration being that the plaintiffs should abandon the proceedings and be taken into the subsequent general receivership as general attorneys with Hagerman's firm. (5) The arrangement by which they went in as attorneys for the receivership under which the receivership at Kansas City was extended over the entire line from Kansas City to the Gulf merged that litigation absolutely in the Federal Court and any claim that they had, if any, and any

claim that they might otherwise have had became merged in and a part of the general proceedings at Kansas City for which they, as attorneys, received their full compensation and allowance against the receivers Fordyce and Withers. (6) As to the two items of $750 each, they were for claimed services in filing ancillary proceedings after they had become attorneys for Fordyce & Withers, receivers, to extend the proceedings over the roads below as a part and in conjunction with the receivership at Kansas City, and they performed the service while they were attorneys for that receivership, in aid of that proceeding, and by order of the United States court to that effect, and these charges for that reason alone can in no way be charged against the defendant. (7) All the items of this account were an afterthought, and were not claimed by the plaintiffs as being a liability of this defendant until after they had gone out as general attorneys for the company and had been superseded by other counsel and at a time when they knew that the receivership of the Guardian Trust Company itself was on hand, and then dated the items back a year and a half to make them correspond with the dates the suits were filed. (8) They never presented any claim to the company nor did the company know that they had any charges of this kind until long after the receivership of the Guardian Trust Company had been wound up and the property turned back to the Guardian Trust Company's hands, and not until the subject of their being superseded as general counsel confronted them. (9) They sent out written statements to the stockholders signed and approved by them long afterward in which the liabilities and assets of the company were stated in detail and none of the claims they make were included in those statements. (10) The item of October 22, of $1500, and the item of October 25, for $200, for services in procuring the discharge of the receiver cannot be charged

against the defendant. It was a part of the duty of the receiver and the attorneys for the receiver to make such application when the time arrived for discharge, and they must be deemed to be a part of the services of the attorney for the receiver for which they have already been paid.

*John A. Eaton* for respondents.

(1) The cases of Trimble v. Railroad, 180 Mo. 574; Trimble v. Railroad, 199 Mo. 44, and Trimble v. Railroad, 201 Mo. 372, were upon many of the same facts involved in this case and the questions determined and decided by this court are the law of this case, and under these decisions and the facts of this case there are no defenses shown in this record against the three groups of items in the account sued upon. (2) The ground of recovery as to group 2 is that the services were rendered directly for the Guardian Trust Company. As to group 3 the services were also rendered directly for the Trust Company. As to group 1 the services were rendered for the Trust Company as · trustee under the mortgages of the Texarkana & Ft. Smith Railway and the Kansas City, Shreveport & Gulf Railroad. It is a well settled rule of law that a trustee in such cases is personally bound for the services of attorneys and other expenses incurred in connection with the trust for the reason that the persons contracted with would otherwise be without remedy, and unless the trustee contracts with reference to such service and expenses, expressly stipulating against its liability, the trustee must personally answer in an action for such expenses. 28 Am. & Eng. Ency. Law (2 Ed.), 1074; Taylor v. Davis, 110 U. S. 330; Hall v. Joel, 94 Mo. App. 361; Hackman v. Maguire, 20 Mo. App. 286; Iron Works v. Kinealy, 86 Mo. App. 199. (3) The Trust Company recognized and accepted the benefits

of the services of the appellees and made claim for the services by intervening petitions filed in the receivership suit, and upon settlement received the amount charged for such services, and the Trust Company is therefore obligated to pay for the services. Reinhard on Agency, secs. 83, 89a and 91; Weeks on Attorneys at Law, sec. 187; 2 Clark & Skyles on Agency, sec. 691; Boyd v. Railroad, 84 Mo. 615; Webb v. Browning, 14 Mo. 355; Taussig v. Railroad, 166 Mo. 28, 186 Mo. 269; Ebel v. Stringer, 102 N. W. 466; Brown v. Arnold, 131 Fed. 723. (4) The Federal Court did not have exclusive jurisdiction of the claim of appellees. Jurisdiction was not pleaded nor raised in the court below. Trimble v. Railroad, 180 Mo. 574. (5) The appellees did not appear upon both sides of the foreclosure suits in Texas, Louisiana and the ancillary suit in Arkansas. They appeared for the Trust Company as complainant only. The proceedings and the receivership after the appointment of Fordyce and Withers were friendly and for the purpose of effecting a consolidation and reorganization of the railway properties and appellees acted as attorneys for that purpose. Trimble v. Railroad, 199 Mo. 44. (6) There was no waiver of the claim of Trimble & Braley in connection with the proposed liquidation of the Guardian Trust Company, nor were there any misrepresentations. There is no defense against the liability of the Guardian Trust Company because of the representations or facts set forth in the circulars. (7) The general officers by their contracts of employment bound the Trust Company in the employment of attorneys. The authority of general officers and managers of corporations to employ attorneys is no longer open to question. 2 Thompson on Corporations (2 Ed.), sec. 1433; Southgaite v. Railroad, 61 Mo. 89; Bank v. Gilstrap, 45 Mo. 419; Lewis v. Pub. Co., 77 Mo. App. 34. (8) The Trust Company employed Wash Adams as its attor-

ney by and through its managing officers and recognized him as its attorney for a long time and paid for his services. There is no proof supporting the counterclaim. (9) Payment to Trimble & Braley by the receivers of the K. C., P. & G. Railroad and by the receivers of the Guardian Trust Co. did not pay for the services sued for, nor for any services for the companies while their properties were in the hands of receivers. Trimble v. Railroad, 180 Mo. 587.

ROY, C.—This is an action on a long account for attorneys' fees and for money paid out as expenses connected with the legal business of defendants. There was a trial before a referee, resulting in a finding for the plaintiffs for $16,265.75, and his report was approved and judgment rendered thereon, from which defendant has appealed.

For several years prior to April 1, 1899, the Kansas City, Pittsburg & Gulf Railroad Company, a Missouri corporation, hereafter called the Pittsburg Company, was engaged in operating a railroad from Kansas City south to the Gulf. It owned the road from Grandview, in the southern part of Jackson county, Missouri, to Mena, Arkansas.

The Texarkana & Fort Smith Railway Company, a Texas corporation, hereafter called the Texarkana Company, owned that portion of the road from Mena to the north boundary of Louisiana, and also that portion from the west boundary of Louisiana through Texas to Port Arthur.

It had executed a mortgage to secure over five and a half millions of bonds in which the Guardian Trust Company, the defendant, under its former name, the Missouri, Kansas & Texas Trust Company was trustee. That mortgage provided: "That in case of default in the payment of installment of interest of the bonds and that it should continue for six months after the payment of the interest, then the

principal of the bonds should become due at the election of the trustee and that in case the default continue for six months upon demand of the person entitled thereto, or upon a requisition in writing signed by not less than one-third of the bonds outstanding, it should be lawful for the trustee personally or by its attorneys to enter upon and take possession of the railroad property at the expense of the trust estate and should be allowed a just and reasonable compensation for its own services and for the services of all agents, clerks, servants or employees.''

And further provided that in case default should continue for a period of six months it should be lawful for the trustee, and upon requisition in writing signed by not less than one-third of the bondholders and adequate expense costs, expenses and liabilities to be by them incurred, it should be the duty of the trustee to proceed under the mortgage either by foreclosure or other appropriate proceedings as the trustee might be advised by counsel.

And article 10 further provided that it should have power to sell property after taking possession under its foreclosure and contained the following provision:

''After deducting from the proceeds of such sale, just allowances for all expenses of the said sale, including attorneys' and counsel's fees and all other proper expenses, advances or liabilities which may have been made or incurred by the trustee in operating said property, or in maintaining the same, or in managing the business of the company while in possession,'' etc.

And also the further provision: ''The trustee shall not be answerable except for its own wilful fault or misconduct or negligence in the discharge of its duties as trustee.

''The trustee shall be entitled to a just compensation for all services it may render, and to be re-

imbursed for all expenses by it paid or incurred in the execution of the said trust; and without indemnity satisfactory to it, it shall not be required to institute, defend or appear in any suit, action or other proceeding relating to the trust property or estate."

That portion of the road in the State of Louisiana was owned by the Kansas City, Shreveport & Gulf Railroad Company, a Louisiana corporation, hereafter·called the Shreveport Company. That company has executed its mortgage to secure over six and a half millions of bonds in which the defendant was trustee. The terms of that mortgage were in effect the same as the mortgage of the Texarkana Company.

From Port Arthur to the Gulf, a distance of about twelve miles, the Pittsburg Company carried on its traffic over the terminals owned by the Port Arthur Channel & Dock Company, but it did not own any interest in those terminals, or in the Channel & Dock Company.

From Grand View to Blair Junction the Pittsburg Company, under a traffic arrangement, ran its trains over a part of what was formerly the old Blair road, and is now a part of the Frisco system. From Blair Junction the business was done over the Kansas City terminals, which were owned as follows: The Kansas City Suburban Belt Railroad Company owned some of the terminals, some were owned by the Union Terminal Railroad Company, and some by the Kansas City Independence Air Line. The Suburban Belt Company owned its road, and owned the stock of the other two terminal roads, and operated them all. The Pittsburg Company had no interest in the Kansas City terminals.

The defendant was incorporated in 1889. The Pittsburg Company executed a mortgage to secure the payment of its bonds to the amount of $25,000 per mile of its track and of the tracks of the Texarkana and Shreveport Companies, all of whose bonds

and stock were owned by the Pittsburg Company. The defendant and the State Trust Company, a New York corporation, were made the trustees under the mortgage of the Pittsburg Company, and as additional security for the bonds secured by that mortgage, the Pittsburg Company delivered to said trustees all the bonds of the Texarkana and Shreveport Companies to be held under said trust.

The defendant held $50,000 of the bonds of the Port Arthur Channel & Dock Company, and also held over $400,000 in notes of the Kansas City Suburban Belt Railroad Company, which were insufficiently secured by some collateral and by some railroad rails, which plaintiffs claim were sufficient to secure but a small proportion of the notes.

As to whether the defendant owned any of the stock or bonds of the Pittsburg Company, the record is in this condition. Mr. Braley testified that it did own some of the stock and bonds of that company, and Judge Trimble in several places in his testimony used language that would bear that construction. But during his examination the following occurred:

"Q. By Referee:—How was the Trust Company interested in the Kansas City, Pittsburg & Gulf Railroad Company, if at all? A. I don't know whether it had any stock and bonds of the Kansas City, Pittsburg & Gulf Railroad Company at that time or not."

We assume, therefore, that it did not own any such stock or bonds, especially as the amount, if any, of such stock or bonds is not given.

Plaintiffs, as partners, had been general counsel for the defendant since about 1890. They were elected and their salary fixed annually. At the election in October, 1898, no salary was named for the general counsel, but they were paid the usual $2000 salary for the following year. Plaintiffs ceased to be such general counsel in October, 1899.

During the two years from October, 1899, to Octo-

ber, 1901, plaintiffs were not general counsel. That place was filled by Mr. Chadbourne, and the offices of the general counsel were moved to Chicago. The plaintiffs during those two years were attorneys in charge of the Kansas City business of defendant without salary and were to be paid reasonable fees for their services. During the year beginning in October, 1901, they were general counsel without salary and were to be paid fees for their services.

The plaintiffs understood as between themselves that, whether one or both were elected as general counsel by the defendant, both of them were to do the work of such counsel and that the salary should be received by the firm.

In October, 1902, Judge Trimble was elected general counsel with a salary of $500 a month, and the following year he was re-elected at a salary of $5000 a year. In October, 1904, he ceased to be such counsel.

Plaintiffs claim that their employment as general counsel only included office work and advice and litigation in Jackson county, Missouri. Judge Trimble testified that it was *his understanding* that the salary did not include litigation outside Jackson county, and that from time to time bills for services in such outside litigation were rendered to and paid by the defendant. The evidence is in harmony with the assertion that such bills were presented and paid.

But the defendant claims that such fees as were paid plaintiffs were for services rendered in matters where the defendant was trustee or fiduciary in some other way, and that such fees were paid out of the trust funds, either directly or indirectly and were not treated as the primary liability of this defendant.

Frank B. Wilcox, who was assistant treasurer of defendant and had charge of the books, vouchers and records, testified that he had looked through the records in vain for an instance where a fee was paid

plaintiffs for services rendered directly to the defendant itself, and that he had no recollection of such a case. He said, "I find many items for other companies handled through the Trust Company, but paid and charged to other companies." From 1892 to 1897, the defendant undertook to conduct a collection department, in connection with which there was a special contract between the plaintiffs and defendant in writing by which it was agreed that plaintiffs should do the legal work in connection with that department and be paid certain fees, and some fees were paid under that contract. But the business did not prove to be of satisfactory volume and it was dropped. Outside of the fees in the collection department and in the fiduciary matters of the  defendant the only fee paid the plaintiffs was one connected with the Freeman Plant at Joplin. The evidence on that item was not clear. Mr. Frank Hagerman testified:

"A railroad mortgage provides for the allowance to the trustee, who is supposed to be a disinterested party, of counsel fees, compensation to the trustee and expenses. I never heard of a case wherein that kind of services the trustee was charged personally. It always becomes a question of allowance in the proceedings. That has been the case in all foreclosures that have ever been conducted in the circuit that I have come in contact with. I have conducted a good many of them myself. I never charged the trustee personally with it. I have always charged it in the case and it comes out of the allowance and ultimate fees."

Plaintiffs were the general attorneys for all the corporations above named, except the State Trust Company, and were attorneys for many other corporations that were subsidiary to the Guardian Trust Company. Judge Trimble was a director and vice-president of the Guardian Trust Company, and as such vice-president received a salary of $4000 per an-

num. Mr. Braley was a director in the defendant company.

There was a by-law of the defendant corporation prescribing the duties and authority of the general counsel, which, among other things, provided, "The general attorney shall have control and general charge of the legal business of the corporation, and of all its litigation. He shall keep himself advised of the character and progress of all legal proceedings and claims by and against the corporation, or in which it is interested."

Plaintiffs admitted that they were familiar with that by-law. On the first day of April, 1899, a suit known as the "Grannis suit," for the purpose of having a receiver appointed for the Pittsburg Company, was filed in the circuit court of Jackson county, and receivers were appointed. The parties to that suit were as follows: Charles E. Grannis, B. J. Hickman, J. J. Cumes and Kansas City Suburban Belt Railway Company v. Kansas City, Pittsburg & Gulf Railroad Company, The Missouri, Kansas & Texas Trust Company (this defendant by its former name) and the State Trust Company of New York. In the petition in that case the Kansas City Suburban Belt Railroad Company was described as a creditor of the Pittsburg Company, and the other plaintiffs therein were described as stockholders in the Pittsburg Company.

Immediately after the appointment of receivers in the Grannis case, suits were brought in Texas and Louisiana in the name of the defendant herein as trustee to foreclose the mortgages given by the Texarkana Company and by the Shreveport Company respectively, and to have receivers appointed therein.

The reasons for bringing the three above mentioned suits were stated by Judge Trimble in his testimony as follows:

"That was the condition of things along in the latter part of 1898; and in the early part of 1899 it became pretty apparent that the installment of interest which the Kansas City, Pittsburg & Gulf Railroad Company would owe on its bonds on April 1, 1899, would have to be defaulted—it could not pay them, unless some arrangement could be made to raise the money outside of the earnings. In view of that fact a number of the stockholders and officers of the Kansas City, Pittsburg & Gulf Railroad Company undertook to get up a reorganization or readjustment of its securities and such a reorganization of the properties as to put the property of the Kansas City, Pittsburg & Gulf Railroad Company and the Kansas City terminals and the Port Arthur terminals all into one company, so as to make it a continuous line, owning its own terminals at both ends. At first the New York committee was organized for the purpose of reorganizing it in the city of New York. They advertised in the paper, asking the stockholders of these various companies, Kansas City, Pittsburg & Gulf Railroad Company, the Kansas City terminal companies and the Port Arthur terminal companies, to deposit their stock and bonds with the committee, so as to carry out the reorganization and consolidate all the property into one company. It soon became manifest that the New York committee was not in any hurry about publishing a plan of reorganization, and the time for the payment of the interest on April 1, 1899, was approaching, and in their impatience other stockholders and officers organized another company to reorganize—the concern known as the Philadelphia committee composed mostly of people who lived in Philadelphia. The New York committee was not favorable to taking into the reorganization the Kansas City terminals or the Port Arthur terminals. The Philadelphia committee was favorable to that, and that was the main difference between the two. Each of

these committees was then advertising for stockholders and bondholders of the companies to come in and deposit so as to give them authority and control of it, so that they might carry out some plan of reorganization. The Trust Company owned I don't know how much—but say $400,000 of the bonds of the Union Terminal Company, which was a part of the Kansas City terminals. It also owned, say, $50,000 of the bonds of the Port Arthur Channel & Dock Company, nearly all of which would be totally—would not be very valuable unless they would go in as a part of the reorganization —as a part of the consolidated plan. As I said, the Philadelphia committee was in favor of that, and the New York committee was not so favorable to it. For that reason the Trust Company was doing all it could, after it found that the New York committee was not in favor of that plan, to encourage the Philadelphia committee in getting the deposit of stock and bonds. All attempts to get money to meet the interest which would mature April 1st had failed. April 1st came along, and the New York committee then having more securities than the Philadelphia committee, which had not fairly gotten under way yet, set out to have a foreclosure suit instituted and a receiver appointed for the Kansas City, Pittsburg & Gulf Railroad Company. I was in New York during these negotiations and saw them all, and was a part of them all. The plan of the New York committee—I mean the purpose of the New York committee—was to have a man by the name of Cornish, who lived either in Minneapolis or St. Paul, appointed as a receiver of the Kansas City, Pittsburg & Gulf Railroad Company. I found on inquiry that Mr. Cornish was a friend of Mr. Harriman and had charge of some of Mr. Harriman's lines, and it was well known that Mr. Harriman was not favorable to reorganizing the property so as to make its stocks and bonds worth anything until after they had gotten it reorganized and after they had bought up the stock

and bonds at a low price. On this account the Trust Company was interested in having somebody appointed as receiver other than Mr. Cornish, and in doing everything that it could to facilitate and help along the efforts of the Philadelphia committee to reorganize on the plan that it proposed.''

"Q. (By the referee:) How was the Trust Company interested in the Kansas City, Pittsburg & Gulf Railroad Company, if at all?

"A. I don't know whether it had any stock and bonds of the Kansas City, Pittsburg & Gulf Railroad Company at that time or not, but it was interested in having these terminals taken in as part of the scheme, and also held a large claim of the Kansas City Suburban Belt Railroad Company, which it expected to have paid if the consolidation was carried out, and that plan the Philadelphia committee was favorable to, and for that reason the Trust Company wanted to help the Philadelphia committee to get control and charge of the reorganization. I am not certain what the purpose of the New York committee was as to the receivership, and what plan they expected to try to carry out. By telegraph and long distance telephone I had suit instituted here to put the Kansas City, Pittsburg & Gulf Railroad Company in the hands of a receiver before the New York committee could get out here and do it. Suit was brought in Kansas City, and the Kansas City, Pittsburg & Gulf Railroad proper was put in the hands of a receiver by Judge Gibson. To go back just a little bit—the Texarkana & Ft. Smith Railroad Company had also made a mortgage to secure its bonds, and the Trust Company, the defendant in this case, was trustee under that mortgage. The Louisiana Company—the Kansas City, Shreveport & Gulf Railroad Company—had also made a mortgage to secure its bonds, and the Trust Company, the defendant in this case, was trustee under that mortgage, also. So, in addition to having the Kansas City, Pittsburg &

Gulf Railroad Company put in the hands of a receiver here by Judge Gibson at Kansas City, we instituted a suit by the trustee, the defendant in this case, to put the Texarkana & Ft. Smith Railway Company in the hands of a receiver. That suit was instituted in the Federal court of the Eastern District of Texas, and that is one of the items charged for in this bill, to which my attention is called in the question. Another suit was instituted by the Trust Company to put the Kansas City, Shreveport & Gulf Railroad Company in the hands of a receiver. That suit was instituted in the State Court of Louisiana at Shreveport. The purpose, of course, in putting those companies down there in the hands of receivers would be so that they would not be entirely dismembered. The Kansas City, Pittsburg & Gulf Railroad, running from Grandview to Mena, would leave the other open to be hawked by anybody, and the intention was to have trustees appointed and operate them as they had been before, as one continuous line. This action was taken on behalf of the Trust Company—putting these three companies in the hands of receivers—for the purpose of holding the question in abeyance of who should be receivers of the company until the stockholders and those interested might have an opportunity to represent their interest to the court, and that, I stated to the New York committee after I had ordered it done—that was the purpose, and the only purpose of it.''

As to the part that the officers of the Guardian Trust Company took in the institution of that litigation, Judge Trimble testified as follows:

"Q. What was done on the part of the Trust Company towards the inauguration and commencement of these proceedings, and what officers, if any, of the Trust Company acted in that respect, and what action was taken?

"Mr. Harkless: If you know.

"A. I understand. I was not here. I have no

knowledge of what action was taken, except I know I was vice-president and general counsel and knew it ought to be done. All knew it was being done and assented to it."

"After I got back from the east, as you call it, which was probably the 3d or 4th of April, 1899, I went over fully the whole matter connected with the railroad company and the trust company's interest in them, with the officers of the Trust Company—with Mr. Martin and Mr. Stillwell, and I either advised them, or they knew then, and our talk was about the suits that had been instituted down in Texas and Louisiana and receivers appointed, and in fact, Mr. Martin, who was vice-president of the Trust Company and took one of the active parts, was one of the receivers appointed down in Louisiana, and they knew all about it, assented to it, and everything was done with their knowledge and consent."

The State Trust Company removed the Grannis suit to the Federal court, and then brought a suit against the Pittsburg Company and this defendant to foreclose the mortgage given by the Pittsburg Company and for the appointment of a receiver.

Then followed an agreement between the plaintiffs as counsel for the plaintiffs in the Grannis suit, and Frank Hagerman, counsel for the State Trust Company, that the Grannis suit and the two foreclosure suits in Texas and Louisiana should be dismissed, and that the plaintiffs and Hagerman should become joint counsel for the receiver in the State Trust Company case, with equal rank and authority, and that the question as to who should be the receivers should be left to the court, and that jurisdiction should be given to the receivers over the whole road from Grandview to Port Arthur. And such ancillary proceedings were had in Texas and Louisiana as resulted in giving the receivers such jurisdiction. The plaintiffs and Hagerman acted as counsel for the receivers, Fordyce

and Withers, during the receivership, and were paid by the receivers under the order of the court. The State Trust Company received $50,000 for its services as trustee in that case.

After Fordyce and Withers as such receivers were given jurisdiction over the whole line, suits were again brought in the name of the Guardian Trust Company, as trustee, to foreclose the mortgages of the Texarkana Company and of the Shreveport Company in the Federal courts of Texas and Louisiana. The reasons for bringing those last suits were given by Judge Trimble as follows:

"The reasons for the institution of that suit were two: First, it was not known then, at that time, and was not for sometime afterwards—whether the Philadelphia committee would get charge of the reorganization or whether the New York committee would get it. The Guardian Trust Company's interest was supposed to be and was, I think, with the Philadelphia committee, and the Guardian Trust Company desired to put itself in a position and maintain a position, as far as it could, where it could resist and do anything that it could to hamper the New York committee if it should get charge of it. That was one reason. Another was that there were a good many debts against the Texarkana & Fort Smith Railroad Company, other than its bonded indebtedness; and it was not known then whether the reorganization committee would desire to foreclose the mortgage and try to cut out those debts or whether they would pay those debts and not foreclose. For the purpose of putting the property in such condition that they might take either course they saw fit to was another reason why this suit was brought. No appointment of receivers was asked in this case and none appointed, and no other action, so far as I know, has ever been taken in the case, except the institution of the suit and the appearance of the defendant to it. I don't even remember whether the

defendant ever answered or not. Its president, Mr. W. S. Taylor, entered its appearance at or about the time it was instituted.

"Q. (By referee),—Is it pending yet? A. I believe it is."

He further testified in substance that those suits were not brought by the direction of the court in the Pittsburg Company receivership case, nor by the direction of the other counsel for the receivers in that case (Hagerman), and that Hagerman would not have wanted it done.

In the latter part of 1899 or beginning of 1900, after plaintiffs had ceased to be general counsel for defendant, Judge Trimble had a talk with Mr. Chadburn, the successor as general counsel, in regard to fees in the cases against the Texarkana and Shreveport Companies. Trimble wanted the Guardian Trust Company to pay. It was then in the hands of a receiver. Chadburn wanted Trimble to agree to take what the court would allow on such claim in the Pittsburg Company receivership. Trimble was unwilling, but furnished a statement of the services rendered and the amount of the fees charged as follows:

| | |
|---|---|
| "In the 1st Texarkana Co. case | $2500.00 |
| In the Shreveport Co. case | 2000.00 |
| In the 2nd Texarkana Co. case | 750.00 |
| In the 2nd Shreveport Co. case | 750.00 |
| | $6000.00" |

Chadburn on behalf of the Guardian Trust Company presented an intervening petition in the Federal court in the Pittsburg Company's receivership matter praying for the payment of the above bill to plaintiffs, and also for the payment of the sum of $5000 to the Guardian Trust Company for its services as trustee in the Texarkana and Shreveport cases.

On reorganization of the railroad companies under the name of the Kansas City Southern Railway Company, it was given possession of the property of the Pittsburg Company and of the Texarkana and Shreveport companies. In 1905 there was some litigation pending in the Federal courts of Texas between the Guardian Trust Company and the Port Arthur Terminal Companies and the Kansas City Southern in which there were opposing claims of considerable amounts. There was a settlement of those matters as a part of which the defendant executed the following indemnity agreement:

"State Trust Company, Complainant v. Kansas City, Pittsburg & Gulf Railroad Company et. al., Defendants.

"The Guardian Trust Company hereby indemnifies and agrees to save harmless the Kansas City Southern Railway Company from any and all claims whatsoever in the nature of attorneys' fees, which claims are made by Trimble & Braley in the interventions in the above entitled cause, filed on March 20, 1900, and set forth on pages 499 to 503, inclusive, in the printed record, and on pages 504 to 508, inclusive, of the printed record; such claims hereby indemnified against, amounting respectively to the sum of $2750.00 and $3250.00, or a total of $6000.00 Dated April 4, 1905."

And the intervening petition filed in the Pittsburg Company's receivership for the allowance of plaintiff's bill for services in those suits was dismissed, by agreement made in that settlement.

It was admitted by the plaintiffs that no indemnity against costs or expense was furnished to the Guardian Trust Company before the institution of the suits in the cases against the Texarkana and Shreveport Companies.

The plaintiffs recovered in the circuit court on the above mentioned items as follows:

| | |
|---|---|
| In the Texarkana Co. case | $2500.00 |
| In the 2nd Texarkana Co. case | 375.00 |
| In the 1st Shreveport Co. case | 2000.00 |
| In the 2nd Shreveport Co. case | 250.00 |
| | $5125.00 |

No entry was made on plaintiff's books concerning their services in the Texarkana and Shreveport cases until about October, 1900. Some of the expenses of the receivership in the Texarkana and Shreveport cases were paid by Fordyce and Withers, receivers.

About November 30, 1900, what was known as the "Bierce suit" was brought against the Guardian Trust Co. and it was placed in the hands of a receiver, Judge Black, who died in May, 1902, and was succeeded by Wash Adams as such receiver. Adams was discharged as such receiver in October, 1902, and the property of the company was turned back to it free of the receivership. The plaintiffs represented the Guardian Trust Company in opposing the appointment of the receiver in that case.

The record does not show what, if any, special arrangement the plaintiffs had with the Guardian Trust Company, that the plaintiffs should represent it in the endeavor to secure the discharge of the receiver. It does not show what, if any, knowledge the officers of the Trust Company had of the fact that the plaintiffs were acting in the capacity of counsel for it in that matter. The record does show that Trimble & Braley were counsel for the Guardian Trust Company for the three years ending November 22, 1902, without salary and with an agreement that they should be paid reasonable fees for such services as they should render the company. It was during the year prior to November 22, 1902, that the application was made for the discharge of the receiver, and that the receiver was discharged.

Judge McKeigan assisted in the argument of the application for the discharge of the receiver, and was paid $1000 or $1500 for his services.

The plaintiffs were allowed in the trial court $3000 for their services in opposing the appointment of the receiver, and there was deducted therefrom $2000 which had been paid on account of that item.

Although the plaintiffs represented the receiver during the whole time from his appointment until the final discharge of receiver Adams, they were allowed in the trial court for their services in endeavoring to procure the discharge of the receiver as follows:

For arguing demurrer to the amended bill
    after the appointment of a receiver ....$ 250.00
Preparing exceptions and answer to the
    amended bill after receiver was appointed .............................. 300.00
Drawing application for discharge of receiver .............................. 200.00
Services in application for discharge of the
    receiver .............................. 1500.00
                                         —————
                                        $2250.00

The receipt given by Trimble & Braley to the receiver for the $7125 paid them for their services, contained the following:

"We the undersigned firm of Trimble & Braley, attorneys at law, do hereby acknowledge that Wash Adams, Esq., as receiver of the Guardian Trust Company, has this day paid to us the sum of $7125, being the amount allowed us by Judge Thayer in his order dated October 4, 1902, discharging the receiver of said Guardian Trust Company. This $7125 is paid and accepted in full compensation for our professional services and expenses to the said Wash Adams as such receiver, and to his predecessor in said receivership, Francis M. Black, and to the Guardian Trust

Company during the receivership, except for services and expenses rendered to or in the case of W. W. Bierce and others against the Guardian Trust Company, but does not pay for any services or expenses prior to the receivership. Dated October 8, 1902, and signed Trimble & Braley.''

The plaintiffs recovered judgment for fees in four different suits brought by the Provident Life & Trust Co. against the different Kansas City Terminal Companies as follows:

| | |
|---|---:|
| K. C. Suburban Belt Co. | $ 750.00 |
| K. C. Independence Air Line | 750.00 |
| Union Terminal Co. | 750.00 |
| Consolidated Terminal Co. | 750.00 |
| Answer in Union Terminal case in Kansas | 500.00 |
| Answer in Suburban Belt Co. | 250.00 |
| Answer in Consolidated Terminal case | 250.00 |
| Answer in Kansas City Independence Air Line | 250.00 |
| | $4500.00 |

Concerning these charges Judge Trimble testified: ''As I have incidentally stated before, the Provident Life & Trust Company, substituted as trustee under the mortgages of the Kansas City Suburban Belt Railroad Company and its allied lines, brought four suits of foreclosure in the United States Circuit Court at Kansas City, and one in the United States Circuit Court for the District of Kansas. The four suits in the Federal court in Kansas City, Missouri, consisted of the Provident Life & Trust Company v. Kansas City Suburban Belt Railroad Company; same plaintiff v. Kansas City Independence Air Line Company; same plaintiff v. Union Terminal Railroad Company; same plaintiff v. The Consolidated Terminal Railway Company; and the case in Kansas was same plaintiff v. Union Terminal Railroad Company.

"Q. The same defendant was sued in both juris-
dictions—that is, the Union Terminal Railroad suit?
A. Yes, sir. Several months before these suits were
instituted, the Kansas City Southern Railway Com-
pany owned all of the bonds of the Kansas City Su-
burban Belt Railroad Company, with the exception of,
say, three or four, and all of the stock of the Kansas
City Suburban Belt Railroad Company, and all of
the stock of the Union Terminal Railroad Company,
Independence Air Line and Consolidated Terminal
Railway Company; and also, on account of owning the
bonds and stocks of these various properties, was
substantially and practically the owner of them. But
the Kansas City Southern Railway Company procured
the Provident Life & Trust Company to institute suit
to foreclose the mortgages on its own property, or on
property in which it was practically the owner, had
control of and was then in possession, operating and
managing and taking its earnings. The Kansas City
Suburban Belt Railroad Company was indebted to the
Guardian Trust Company in a large sum, something
over $400,000 for which the Trust Company held the
notes of the Suburban Belt Railroad Company, and
these debts were not secured except by collateral se-
curity and these railroad rails, which were not suffi-
cient to secure the entire indebtedness. The animosity
that had grown up at that time between the people
that had control of the Kansas City Southern Railway
Company and Mr. Stilwell and those in charge of the
Guardian Trust Company, showed to me that the in-
debtedness to the Guardian Trust Company from the
Kansas City Suburban Belt Railroad Company, was
not going to be paid unless they were obliged to pay
it and compelled to do it. So when the Provident
Life & Trust Company at the request of the Kansas
City Southern Railway Company, instituted these
foreclosure suits, it did not make the Guardian Trust
Company, who was the original trustee under the

mortgage—some of them the sole trustee and in one other cotrustee with the Provident Life & Trust Company, a party to the suits at all, I thought, and think yet, that upon a showing of the fact that the real purpose in the attempted foreclosure of these mortgages was not to collect the debt, because the real person who had the suit brought already held the debt and had the stock and owned the property, but that it could have had no other purpose than to cut out the indebtedness which the Kansas City Suburban Belt Railroad Company owed to the Guardian Trust Company, and possibly other debts which the Suburban Belt Railroad Company owed, which had not been secured or paid, unless there might have been a purpose, inasmuch as they did not hold all of the bonds—lacking four or five—that they wanted to get rid of the old mortgage as a formal matter, so as to get a new mortgage on the consolidated property which would be a first lien on it.

"And I thought on a showing of this fact that the court ought either to refuse to foreclose the mortgage when such purpose was manifest, or to provide that if it was sought to be foreclosed for any legitimate purpose, that it should be only done upon the condition that the unsecured debts should not be cut out, and I wanted to get the Guardian Trust Company made party to the suit so as to raise that question. I prepared a petition in each one of these foreclosure suits, asking the court to allow the Guardian Trust Company to come in as a party defendant and to plead and answer to the bills of foreclosure, and set up in the petition the reasons why—set up the facts in the general way I have stated—set up about the facts of the reorganization, and that the purpose was to cut out the debts and not to foreclose the mortgage for any legitimate purpose.

"Now these petitions were prepared after the suits were filed and before the day which the defend-

ant railroad company was required to answer. I will state, in this connection, that there was no hope of the railroad companies themselves resisting the foreclosure. The attorneys that appeared for the various railroad companies were the attorneys of the Kansas City Southern Railway Company, and they had incited the suit to be brought. They appeared and consented to the appointment of receivers, and if there was to be any resistance made, it was necessary for the Trust Company to make it."

Those petitions each contained the following paragraph: "Fifth. That it was a part of the plan and agreement of reorganization, that the said Philadelphia committee should cause a syndicate of capitalists to be formed, who would buy enough of the stock and bonds of the said Kansas City Southern Railway Company which would not be needed to retire and convert the stock and bonds of the old companies sought to be unified, and pay off and discharge all of the floating or unsecured debts and obligations of all of the old companies, including those of the said defendant, The Kansas City Suburban Belt Railroad Company; that said part of said plan was carried out; such a syndicate was formed, and enough of the securities of the Kansas City Southern Railway Company were sold to said syndicate to provide money to satisfy and discharge all the floating and unsecured debts and obligations of all of said companies so sought to be united under the ownership and control of the said Kansas City Southern Railway Company, including all the floating and unsecured debts of the said defendant, The Kansas City Suburban Belt Railroad Company; but the said Philadelphia committee and the said Kansas City Southern Railroad Company, which it controls, have wrongfully withheld said money, and have unlawfully and fraudulently failed and refused to apply the same to the purposes for which it was raised, to-wit, to the payment of the said floating and

unsecured debts and obligations of the defendant, The Kansas City Suburban Belt Railroad Company, and the other old companies so amalgamated as aforesaid under the said plan of reorganization.''

After the petitions to be made a party in those cases had been prepared, the plaintiff therein voluntarily made the Guardian Trust Company a party defendant in all those cases, and Trimble & Braley prepared and filed answer for the Guardian Trust Company in each of those cases, which answers were in substance the same as the petitions which had been previously prepared. As to the extent of the services, Judge Trimble testified:

''I know up to the time these petitions were drawn and prepared, there had been a great deal done, and we did a great deal along the same line afterwards for the same general purpose. I don't know—except that I lived in the thing from the time the suits were brought until a receiver of the Guardian Trust Company was appointed—I did not do anything else hardly. The responsibility about it was immense. The anxiety about it was immense. I did the very best that any one person of my limited capacity could have done.''

The result of the litigation was that the court decided that the question raised by the Guardian Trust Company could not be litigated in that suit; the mortgage was foreclosed on the Kansas City terminals, and the Kansas City Southern became the purchaser. But the decree in those cases reserved to the Guardian Trust Company the right to sue the Kansas City Southern on account of those matters.

During the time while plaintiffs were general counsel for the defendant in 1903 and 1904, Mr. Wash Adams rendered legal services to the Guardian Trust Company in the suit brought by the Cambria Steel Company against the Guardian Trust Company et al. in the Federal court at Kansas City, and in Port Arthur Channel & Dock Company v. Guardian Trust

Company et al. and in several other cases in the courts
in Texas. These were very important cases, involv-
ing perhaps a half million dollars, and the investiga-
tion of complicated questions of fact and law. There
arose a contention between Trimble & Braley on one
side and the Guardian Trust Company on the other
as to which should pay Adams's fees. The Trust Com-
pany contending that as Trimble & Braley were paid
$6000 in 1903 and $5000 in 1904 as a salary to attend
to the company's legal business, and that as Trimble
& Braley constantly out of their own means paid law-
yers to help them in their legal work, they ought to
pay the Adams bill and protect the company from it.
Finally, the company concluded that, as Adams was
not supposed to know the terms of employment be-
tween Trimble & Braley and the company, and had
a right as against the company to claim that it had
employed him, it should pay the bill to Adams and
look to Trimble & Braley for reimbursement. It paid
the bill of $6000, and asked for a reimbursement in
a counterclaim in this suit. The preponderance of
the evidence was to the effect that owing to the large
amount and important questions involved in that lit-
igation, and the number and ability of the lawyers on
the other side, the Guardian Trust Company decided
to have additional counsel in the matter and directed
Judge Trimble to employ Mr. Adams. The finding of
the referee on this point was as follows:

"Seventh. On the issues joined by the defend-
ants' third counterclaim (being count eighteen of the
answer) and the reply, I find for the plaintiffs. The
claim is for $6000 paid by the defendant to Mr. Wash
Adams for legal services rendered to the defendant
but which defendant claims should be charged against
the plaintiffs on the asserted ground that the employ-
ment of Mr. Adams was on the plaintiffs' personal
account, and the cost of his service should therefore

be borne by the plaintiffs. There is no sufficient evidence to sustain this contention but abundant evidence from which I find that the fact was not as defendant alleges."

On July 1, 1904, there was sent out a statement by members of the executive committee of the Guardian Trust Company showing the liabilities of the company. It did not show any liability to Trimble & Braley. It contained this statement:

"On account of the vast litigation on hand there are some liabilities not shown above in the way of attorneys' fees and court costs, the amount of which cannot be accurately given, but which will not materially affect the above showing."

That statement was sent out to the stockholders of the company in connection with a letter which was signed by Judge Trimble as a member of the executive committee. He testified with reference to that statement:

"Q. Does that statement which you have just read, in reference to attorneys' fees, have reference to this bill of yours for services already performed? A. I did not prepare the statement and have no recollection about that.

"Q. Do you now contend that it had reference to this bill of $22,000 for services already performed? A. I don't make any contention about it.

"Q. Can you give any reason why this liability of $20,000 was not put in that statement? A. No, sir, except that I did not know how much it was, because I had never footed it up. The Trust Company did not know how much it was, it had never been presented to them all together up to this time, but on several occasions prior to this, when Mr. Willey was making out financial statements of the Trust Company, showing its assets and liabilities, sometimes for the stockholders' meeting, sometimes for the purpose of distribution in connection with circular letters like these, I called his

attention, when looking over the statement, that he did not have anything in it about attorneys' fees. I called his attention to the fact that the Trust Company owed Trimble & Braley a bill, and that they would owe Ivens and his firm in New York a bill, and owe Solomon, Wollman & Cooper a bill, and owed Lyons of Lincoln a bill. He said that the reason was that they never got on the books of the company, and it went along that way. On each occasion when a statement was presented, that I saw our bill was not put down, I called his attention to it, and he gave that as his reason, and said there were other bills outstanding that never got on the books of the company.

"Q. Your idea is that the committee, when it sent out that statement, knew you had a bill, but did not put it in there? Is that the idea you wish to convey by that? A. This statement is dated July 1, 1904. The testimony already given in this case will show that I wrote a letter, sending an itemized statement of this bill to Mr. Harris, as president of the company and as president of the executive committee, and to Mr. Martin, on March 20, 1904, setting out the bill in full, so that the executive committee ought to have known, and did know, of the existence of the bill at this time.

"Q. Was there any purpose, in sending out that circular, to conceal the fact that you did have a bill? A. No, sir, I called attention to the fact, and that is probably the reason they put in this, because it did not include our bill.

"Q. That has reference only to litigation pending? A. That is the way it was worded. I did not word that. That probably gave rise to that note. Most of this bill we have is litigation still pending—was still pending and is yet—the great part of it, not all of it, however."

Mr. Willey testified that he was auditor and later secretary of the Guardian Trust Company, and that the plaintiff's claim for fees was sent to Judge Black

while he was receiver, but that the receiver declined to make any record of it, and that it was not put in the statement sent out because it was not on the books, and none of the books or records of the Guardian Trust Company made any reference to such claim until sometime in 1904.

On the discharge of the receiver of the Guardian Trust Co., the following was drawn by Judge Trimble and incorporated in the order of the court:

"That if any claim or demand be made upon the Guardian Trust Company or any of its officers or agents for the payment of any alleged debt or obligation of the Trust Company, contracted prior to the discharge of the receiver, other than those mentioned in Schedule A and Schedule B hereto attached, the person named by the minority of stockholders, who have made formal objections to the discharge of the receiver, as their representative on the board of directors and executive committee, shall be notified of such claim or demand before the same or any part thereof shall be paid or otherwise recognized, and if said representative of the minority stockholders, or any member of the executive committee shall object to the payment thereof, the question as to whether or not such claim ought to be paid shall be presented to this court for its action and determination."

Three different suits brought by the plaintiffs herein against the several railroad companies for legal services have been decided by this court and are reported in 180 Mo. 574, 199 Mo. 44, and 201 Mo. 372.

The basic facts of this case are undisputed, except as to the value of the legal services rendered by the plaintiffs. As to such value, we see no reason to change the result reached by the referee. On all other questions we are free to draw our own inferences from admitted facts and to apply the law thereto. The items to which objections are made by the defendant

have been divided into four different groups; and we shall consider those groups of items *seriatim*.

I. The plaintiffs recovered in the trial court $5125 for services in the suits brought by the Guardian Trust Company against the Texarkana Company and the Shreveport Company. We have reached the conclusion that there can be no recovery for any part of such services, for the following reasons:

The railroad from Grandview to Port Arthur, including the property of the Pittsburg, the Texarkana and the Shreveport Companies, was all owned in the manner above stated by the Pittsburg Company. The Pittsburg Company had no interest in the terminals either at Kansas City or Port Arthur. In its own right the Guardian Trust Company had no interest of any kind in the Pittsburg Company or in its two subsidiary companies. The only right it had was as trustee in the mortgages given by those companies respectively. The Guardian Trust Company was not in its own right directly concerned in any reorganization of the Pittsburg Company.

There is not in the record any suggestion that any such reorganization would enhance the value of the $50,000 in bonds of the Port Arthur Channel & Dock Company held by the Guardian Trust Company. There is a contention that it was the intention of the Philadelphia committee to include the Kansas City terminals in the reorganization, and that, as a part of that plan, the debt of the Suburban Belt Company to the Guardian Trust Company was to be taken care of. That result was too remote to be considered here. If the Suburban Belt Company was solvent, the Guardian Trust Company could have collected its claim against it by direct suit. If it was insolvent, it is hard to see how any reorganization committee would consent to pay its unsecured debts. But, be that as it may, the Philadelphia committee did get charge of

the reorganization, but the debt of the Suburban Belt Company to the Guardian Trust Company was not taken care of. That debt remains unpaid. Though all the beneficent purposes of that reorganization were accomplished so far as all the other companies were concerned, yet as to the Guardian Trust Company, those contemplated results failed to materialize. The first suits brought about April 1, 1899, against the Texarkana Company and the Shreveport Company respectively were purely ancillary to the Grannis suit, which was brought to put the Pittsburg Company in the hands of a receiver. The purposes of those ancillary suits are to be ascertained by finding what were the purposes of the Grannis suit. If there is anything self-evident in the facts, it is that the Grannis suit was not brought in order to secure the payment of the debt of the Suburban Belt Company to the Guardian Trust Company. Why? Because, in that suit the Suburban Belt Company was a plaintiff and the Guardian Trust Company was a defendant. Trimble & Braley were, at the time of the institution of that suit, the general counsel for both the Suburban Belt Company and for the Guardian Trust Company. So far as the record shows, Trimble & Braley had no specific directions from either of those companies to bring any suit. Whatever suit was brought was instituted by their general authority as such counsel and at their own discretion. One would naturally suppose that if the purpose of the Grannis suit was to collect that debt, the Suburban Belt Company would have been made a defendant and the Trust Company a plaintiff in that case.

The plaintiffs as general counsel could have brought suit in the name of the Guardian Trust Company as one of the trustees in the mortgage of the Pittsburg Company, to foreclose that mortgage, just as was done by the State Trust Company, the other trustee. The State Trust Company in the suit which

it brought got an allowance of $50,000 as its compensation as such trustee, while the Guardian Trust Company was made defendant in the Grannis suit and got no compensation as trustee. The plaintiffs did not claim any fee from the Guardian Trust Company in the Grannis suit, because the record showed they were on the other side. They have no more right to compensation against the defendant herein for services in the Texarkana and Shreveport cases than in the Grannis case. Those ancillary proceedings were not brought with any intention of foreclosing those mortgages or of executing the trusts created in said mortgages. As was stated by Judge Trimble: "This action was taken on behalf of the Trust Company, putting these three companies in the hands of receivers, for the purpose of holding the question in abeyance of who should be receivers of the company until the stockholders and those interested might have an opportunity to present their interest to the court, and that, I stated to the New York committee after I had ordered it done, that that was the purpose, and the only purpose of it." So, by the clear statement of the plaintiffs, the Texarkana and Shreveport suits were not for the purpose of carrying out any of the purposes of those mortgages.

In Trimble v. Railroad, 199 Mo. 1. c. 50, the court, in speaking of those suits, said, "In addition to the suits above mentioned there were other suits, in Texas, in Louisiana and Kansas, which are mentioned in the evidence, but those served their purpose, which seems to have been a race of diligence for the control of the litigation through receiverships and were dismissed when an agreement was reached."

The name of the Guardian Trust Company as trustee was used in those suits for purposes which, however proper and commendable in other respects, were entirely outside of the sphere of the duties of such trustee. Such being the case, neither the Guard-

ian Trust Company nor the plaintiffs could recover against the mortgagor anything for their services in those cases. The mortgages provided, ''The trustee shall be entitled to a just compensation for all services it may render, and to be reimbursed for all expenses by it paid or incurred in the execution of the said trust; and without indemnity satisfactory to it, it shall not be required to institute, defend or appear in any suit, action or other proceeding relating to the trust property or estate.''

Now those ancillary suits were brought in the name of the trustee without any special direction therefor, but merely under Trimble & Braley's authority as general counsel and at their own discretion. They were not brought in the interests of the Guardian Trust Company in its own right. They were brought in its name as trustee for purposes other than the execution of the trust. Such being the case, the Guardian Trust Company could not possibly be benefited in any way by them. The only thing which could concern it was the liability it might incur by the suit. The mortgage provided that it should be indemnified before being required to sue, but such indemnity was not provided for.

At the last, it was arranged between Trimble & Braley on one side and Hagerman on the other that the Grannis suit and the ancillary suits should be dismissed and that Trimble & Braley should become joint counsel with Hagerman for the receivers of the Pittsburg Company in the suit brought by the State Trust Company against the Pittsburg Company and against the Guardian Trust Company. No effort was made by the plaintiffs herein to secure any allowance to the Guardian Trust Company by reason of its having brought such ancillary suits. As there was no possibility of any benefit that could accrue to the Guardian Trust Company by reason of those suits, and as they were brought in their own discretion by the plaintiffs

herein without special direction of the trust company, and as the only benefits that could accrue therefrom accrued to others than this defendant, there is no reason in law or equity why it should pay for such services, especially in view of the facts that Trimble & Braley, by dismissing the ancillary suits, received fees as counsel for the receivers while the Trust Company got nothing.

The last two suits in Texas and Louisiana, though brought by plaintiffs herein as attorneys in the name of the Guardian Trust Company as trustee, were brought on the initiative of the counsel without previous special direction of the Trust Company, and were not brought for the purpose of executing the trust created in the mortgages. Their object was to hamper as much as possible the New York committee, and to bring about a compromise of the unsecured debts of those two companies, and for no other purpose. It is contended by the plaintiffs that because in a settlement between the Guardian Trust Company on one side and the Kansas City Southern Railway Company and other parties on the other, the Guardian Trust Company indemnified that Railway Company against the claim for such fees, that therefore the Guardian Trust Company is liable to Trimble & Braley therefor.

We think not. One who, for a consideration, indemnifies against the claim of a third person, does not assume any liability to such third person. If, in such settlement, the railway company had paid or allowed to the Guardian Trust Company any amount to be paid to Trimble & Braley on account of such fees, such amount could have been recovered in an action for money had and received.

But this is not such a suit, and no such facts appear. The Guardian Trust Company was not allowed money on account of such fees, but did in consideration of such settlement indemnify the railway com-

pany. By such indemnity it in no way recognized any right in the plaintiffs to such fees.

The fact that counsel for the trust company, after a conversation with one of the plaintiffs in regard to the matter, presented an intervening petition in the Pittsburg receivership case for an allowance of such fees does not render the defendant liable therefor. Such fact was no more than a favor shown these plaintiffs and did not by estoppel or in any other way bind the trust company for such fees.

The plaintiff cannot recover on the items in the first group for the further reason that they were, for the period covered by those services, the general counsel for the defendant at a stated salary. Though the record of the company for October, 1898, did not show that the amount of the salary was fixed, yet, as it had been fixed for previous years at $2000 and that amount of salary was actually paid them for the year beginning in October, 1898, that amount was fixed by the conduct of all parties as the salary for that period. The fact that the plaintiffs "understood" that the salary did not include extra-urban litigation cannot change the situation. Some fees were paid plaintiffs for services, but in every case but one it was clearly shown that they were fees really not paid by defendant but out of trust funds in its hands in behalf of which funds the services were rendered. The reason for the payment in the one case mentioned does not clearly appear.

The fact that plaintiffs were officers of the defendant corporation, and that the by-laws of that corporation prescribed their duties as general counsel and did not limit their salary to the urban business, in the absence of a showing to the contrary, precludes them from a recovery of fees in addition to their salary.

It was held by the St. Louis Court of Appeals in Besch v. Carriage Co., 36 Mo. App. 333, that the compensation of an officer of a corporation who is also a

director must be fixed by corporate action on the books of the corporation.

Without expressing any opinion as to the soundness of that rule, we hold that there is an utter absence of any showing of facts that would entitle plaintiff to fees in addition to their salary.

II. Under group number two, the plaintiffs were allowed $3000 for resisting the appointment of a receiver in the Bierce suit against this defendant. From that amount a payment of $2000 was deducted and plaintiff recovered the difference of $1000. We approve that allowance. The services were rendered before the receiver was appointed, and compensation therefor was not included in the amount paid plaintiffs by the receiver.

The plaintiffs were also allowed items to the amount of $2250 for services rendered by them after the appointment of a receiver for the Guardian Trust Company, and while plaintiffs were acting as counsel for such receivers. The services were rendered in procuring the discharge of such receiver.

While plaintiffs were counsel for the receiver, they also had general charge of the business of the Guardian Trust Company as its counsel at Kansas City. There is nothing in the record to show that after the plaintiffs became counsel for the receiver, they were directed or expected by the Guardian Trust Company to represent it as against the receiver. The proceeding to discharge the receiver was adverse to the receiver and adverse to the plaintiffs as his attorneys. The success of such proceeding would result in the receiver and his attorneys losing the emoluments of their respective positions. The rule that attorneys for the parties should not be allowed to act as counsel for the receiver is laid down in Alderson on Receivers, section 40, and in Beach on Receivers (Alderson's Ed.). section 274, also in High on Receivers (4 Ed.), sections 188 and 216.

It may be conceded for present purposes that if the Guardian Trust Company, knowing the plaintiffs were counsel for the receiver, employed them to procure the discharge of the receiver, it would be liable for their fees. But there is nothing in the record to show that the defendant herein knew that plaintiffs were rendering such service, or that plaintiffs expected to be paid therefor by the defendant. Judge McKeigan rendered services in the matter to the defendant and was paid therefor. The fact that plaintiffs were in general charge of defendant's business in Kansas City would not authorize them to act for the defendant herein in a proceeding to remove the receiver whom they represented.

The law presumes that the Guardian Trust Company did not expect them to act for it in such proceeding.

In Trimble v. Railroad, 199 Mo. l. c. 55, it was said: "It was shown in the evidence that in some of the suits mentioned the plaintiffs occupied, at least nominally, positions antagonistic to the interests of their clients, but that was never really so. In all that they ever did they were loyal to the interests of their clients." We find no fault with that statement of the law, and approve it. But a proceeding to discharge a receiver is in legal effect antagonistic to the receiver on the face of it. Let it be conceded, as it should be, that plaintiffs in good faith and with great ability rendered services in procuring the discharge of the receiver. Has not the defendant the right to insist that it, knowing the plaintiffs represented the receiver, did not authorize them to represent it in the matter, and had no reason to think that plaintiffs would expect it to pay? We think so, and the items amounting to $2250 allowed for such services are disallowed.

III. In group number three the plaintiffs were allowed $4500 for services in the terminal foreclosure

suits. The appellant makes the bold claim that the course pursued by Trimble & Braley in that terminal litigation was useless and for the purpose of charging fees against the defendant. Counsel for appellant in their brief say: "Nothing ever came of these suits. No subsequent action was taken upon them. The original suits went on and were foreclosed and nothing done in reference to those matters. How futile and imaginary were these proceedings."

Yet the pleadings filed in those cases by the plaintiffs as counsel for the Trust Company called attention to facts which it was charged made the Kansas City Southern liable for the debt of the Suburban Belt Company to this defendant.

The decree in those cases reserved the right to the Guardian Trust Company to litigate those facts with the Kansas City Southern in any suit it might afterward bring. We find the case of Guardian Trust Company v. Kansas City Southern Railway Company reported in 76 C. C. A. 615, and again reported in 96 C. C. A. 285. An examination of those reports shows that the Guardian Trust Company for several years followed the valuable suggestions made by the plaintiffs in that litigation, in its endeavor to recover the debt due it from the Suburban Belt Company. For several years it has pursued the course devised by Trimble & Braley, and is in no position to say that such course was ill-advised. The allowance of the $4500 in favor of the plaintiffs was proper and we approve it.

IV. As to the claim of appellant for a reimbursement of the $6000 paid to Wash Adams, we are satisfied with the action of the referee thereon. The evidence amply shows that the defendant suggested the employment of Mr. Adams because of the importance of the litigation and of the number and ability of the lawyers on the other side. Adams's fees were a pri-

mary liability of the defendant and cannot be shifted to the shoulders of these plaintiffs.

V. The order made on the discharge of the receiver of the Guardian Trust Company by the Federal court to the effect that any demand for a debt contracted by the Trust Company prior to the appointment of the receiver should be presented to that court did not take away the jurisdiction of the circuit court in which this suit was brought.

This suit is *in personam.* There is no question here involved as to any special property or funds of the defendant out of which the judgment to be recovered may be paid. That receivership was not a bankruptcy proceeding which absolved the Trust Company from its creditors.

Counsel have not cited any authority for holding that the trial court had no jurisdiction of the cause. The purpose of that order was doubtless to prevent claims from being paid to which some of the parties interested in the corporation might object, until the validity of such claims could be judicially determined.

The defendant is able to make as efficient a defense to this claim in this proceeding as it could have made in the Federal court.

The judgment is reversed and remanded with directions to enter judgment in accordance with this opinion.

*Blair, C.,* concurs in paragraphs III, IV and V; concurs in the result in paragraph I, and dissents from the disallowance of the $2250 item in paragraph II.

PER CURIAM.—The foregoing opinion of Roy, C., is adopted as the opinion of the court. All the judges concur.